## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | Chapter 13 |
| | : | |
| WENDY ANN LEWIS, | : | |
| | : | |
| Debtor. | : | Bankuptcy No. 10-12633 JKF |
| ――――――――――――――― | : | |
| | : | |
| HARTFORD FIRE INSURANCE | : | |
| COMPANY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| WENDY ANN LEWIS, | : | |
| | : | |
| Defendant. | : | Adversary No. 10-0354 |
| ――――――――――――――― | : | |

# O P I N I O N

**BY:  JEAN K. FITZSIMON**
**United States Bankruptcy Judge**

# I.  INTRODUCTION

The Plaintiff in this adversary proceeding (the "Adversary Proceeding"), Hartford Fire

Insurance Company ("Hartford"), is the insurer and indemnitor for the losses of Aerogroup

International, Inc. ("Aerogroup").[1]  In this litigation, Hartford seeks to hold the Defendant/Debtor

Wendy Ann Lewis ("Ms. Lewis") liable for a scheme in which the Shipping Manager of

---

[1]      Aerogroup Retail Holdings is the 100% owned subsidiary of Aerogroup International,
Inc. and is responsible for the retail stores and, consequently, payment of shipping costs.  (Notes of
testimony, hereinafter "N.T.," at 17).

Aerogroup, Samuel Nysenbaum ("Nysenbaum"), created a sham entity allegedly in order to

defraud his employer.[2]  According to the Plaintiff, an entity called KIS Transport, Inc. a/k/a KIS

Transport, a/k/a KIS Logistics  ("KIS" or the "Company"),[3] was used as a bogus shipping

corporation in order to skim money from Aerogroup.  Nysenbaum allegedly charged Aerogroup

for shipping merchandise, obtained a lower price for shipping through KIS, and pocketed the

difference.  This scheme apparently amounted to a windfall of approximately $309,000.  Hartford

alleges that because Ms. Lewis was a necessary, willing and essential participant in Nysenbaum's

plan, she is responsible and liable for Aerogroup's (and thus Hartford's) loss.

The seven-count complaint (the "Complaint") filed by Hartford against Ms. Lewis states

the following causes of action: 1) violation of the Racketeer Influenced and Corrupt

Organizations Act ("RICO"); 2) Conspiracy to Violate RICO; 3) Fraud; 4) Conspiracy to

Commit Fraud; 5) Unjust Enrichment; 6) Conversion; and 7) Negligent Misrepresentation.  (Doc.

# 1).  The Complaint also seeks a denial of the discharge of any debt owed by Ms. Lewis to

Hartford pursuant to §§ 523(a)(2) and (4) of the Bankruptcy Code.  In addition to the Complaint,

Hartford is pursuing its proof of claim in the Debtor's bankruptcy case in the amount of

$929,985.60.[4]  (See proof of claim # 3, the "Proof of Claim").  The Debtor opposes the relief

sought in the Proof of Claim and in the Complaint.

---

[2]      On December 22, 2010, KIS Transport, Inc. a/k/a KIS Transport a/k/a KIS Logistics was
dismissed from the Adversary Proceeding due to the fact that no answer was filed on behalf of this
Defendant and no motion for default judgment was brought by the Plaintiff.  (Doc. # 16).

[3]      "KIS" in this Opinion will refer to KIS Transport, LLC.  This company sometimes will
be distinguished from KIS Logistics.

[4]      The Proof of Claim is based on, and attaches, a complaint against the Debtor (and others)
by Hartford in the District Court of the Eastern District of Pennsylvania.  See Proof of Claim, Ex. B (the
"District Court Complaint").  The District Court Complaint is substantially similar to the Complaint in
this Adversary Proceeding.  The District Court action was stayed by the inception of Ms. Lewis'
bankruptcy case.

Following a one-day consolidated trial[5] of these matters on February 28, 2012, and for the reasons discussed in detail below, the court determines that Hartford has failed to prove Ms. Lewis' liability with regard to any of the seven causes of action stated in the Adversary Proceeding and failed to sustain its burden as to the Proof of Claim. No damages, therefore, will be assessed in favor of the Plaintiff and the Proof of Claim will be disallowed.

## II.  PROCEDURAL HISTORY

The Debtor filed for Chapter 13 bankruptcy protection on April 1, 2010. On April 15, 2010, she proposed a plan providing for payments of $30 a month (the "Plan"). However, following objections to the Plan by both the Chapter 13 Trustee and Hartford, (see Doc. #'s 28 and 53 in the main case), the confirmation hearing has been continued many times and is currently scheduled for July 26, 2012. The seven-count Complaint in the Adversary Proceeding was filed on September 7, 2010 and is substantially similar to the District Court Complaint (on which the Proof of Claim is based). An Answer to the Complaint was filed by the Debtor on October 8, 2010. On July 6, 2011, for reasons stated on the record, the court denied the Plaintiff's motion for partial summary judgment (on Count III). (Doc. # 38).

The Proof of Claim was filed by Hartford on October 4, 2010; the Debtor objected to the Proof of Claim on November 12, 2010. Following an uncontested motion by Hartford, the Proof of Claim and the Adversary Proceeding were consolidated. (Doc. # 14).

---

[5]     Although the Complaint originally demanded a jury trial, Hartford did not pursue this relief, neither in its many pretrial briefs and motions, nor orally in the pretrial hearings leading up to the trial. Therefore, this demand is considered waived. See e.g., White v. McGinnis, 903 F.2d 699, 703 (9th Cir. 1990) ("knowing participation in a bench trial without objection is sufficient to constitute a jury waiver.").

Three witnesses testified at the consolidated trial on February 28, 2012:  John Spina ("Spina"), Vice President and Corporate Counsel of Aerogroup; the Debtor; and James Palumbo ("Palumbo"), President of William Palumbo Trucking, Inc.[6]

## III.  FINDINGS OF FACT

Upon consideration of the testimony and documentary evidence offered at trial, as well as the pleadings, including the Joint Pretrial Statement, the court makes the following findings of fact:

**Background of Ms. Lewis**

1.  Ms. Lewis is in her early forties and lives in a home she owns, located at 105 Beaumont Drive in Newtown, PA (the "Debtor's Address").  She purchased this home in approximately 2001.  (N.T. at 101).

2.  The Debtor did not complete high school, nor has she received an equivalent degree (a "GED").  Ms. Lewis went to a "career center" for two years after leaving high school.  (N.T. at 23).

3.  Ms. Lewis met Jim Condon ("Condon"), her current boyfriend and the father of her only child, when she was 26 or 27.  (N.T. at 101).  Condon and the Debtor have been living together since about 2007.  (N.T. at 102-103).  He pays their household bills.  (N.T. at 102).

4.  After leaving high school, the Debtor worked as a waitress and at a retail store before becoming an exotic dancer at Delilah's Den in Philadelphia (the "Club") when she was 23 or 24 years old.  (N.T. 23).  Ms. Lewis worked at other similar establishments in New Jersey and Pennsylvania.

---

[6]      Palumbo Trucking is a company that did business with KIS.

-4-

5.  While employed as a dancer, the Debtor earned between five hundred and one thousand dollars a night in cash.  (N.T. at 92).

6.  Ms. Lewis discontinued her employment at the Club when she became pregnant with her daughter in early 2004; she has not worked at all since that time.  (N.T. at 30).

7.  Ms. Lewis maintains her own checking account and has never bounced a personal check.  (N.T. at 78).

## Ms. Lewis' Relationship with Mr. Nysenbaum

8.  Ms. Lewis met Sam Nysenbaum[7] sometime in approximately 1998 while working at the Club.  (N.T. at 24).

9.  Nysenbaum was morbidly obese, weighing approximately 600 pounds.  (N.T. at 27).

10.  During the time that Ms. Lewis was employed, Nysenbaum would visit the Club two or three times a week for several hours at a time.  (N.T. at 24, 25).

11.  Nysenbaum paid the Club $400 an hour to spend time with Ms. Lewis.  The two spent this time talking or watching sports.  (N.T. at 26).

12.  Nysenbaum and the Debtor became friends approximately one year after they met at the Club.  They began socializing outside of Ms. Lewis' work, going to the movies or out to eat together.  (N.T. at 26, 27).

13.  Ms. Lewis found Nysenbaum "kind" and "funny," and appreciated that he treated her "like a human being."  (N.T. at 27, 28).

14.  At no time was the Debtor dating Nysenbaum, nor did the two have a sexual relationship.  (N.T. at 27).

---

[7]      Nysenbaum was employed by Aerogroup from October 4, 1999 to the day he died, December 11, 2006.  (See Ex. 15).

15.  The Debtor took a few trips with Nysenbaum, to Atlantic City and to Las Vegas.
(N.T. at 28).  Ms. Lewis' daughter and parents accompanied her at times on trips to Atlantic City
with Nysenabum.  (N.T. at 28-29).

16.  Ms. Lewis met Nysenbaum's family.  (N.T. at 28).

17.  Ms. Lewis and Nysenbaum did not spend time talking about Nysenbaum's work and
the Debtor had no real understanding of what he did for a living.  Ms. Lewis understood that
Nysenbaum "did something for Aerosols,[8] the shoe company, and he also had a couple of
consulting companies that were his own."  (N.T. at 30).

18.  Mr. Nysenbaum helped Ms. Lewis with various matters, such as buying a home and
finding an accountant to assist with her tax returns.  (N.T. at 31).

19.  Nysenbaum bought the Debtor and her daughter gifts in the nature of "trinkets" and
gave Ms. Lewis small amounts of money to run errands for him.  (N.T. at 81, 110-111).
Occasionally, while Ms. Lewis was working at the Club, Nysenbaum bought gowns for her to
wear while she performed.  (N.T. at 110).

20.  Because the Debtor appreciated this assistance, she wanted to help Nysenbaum in
return.  (N.T. at 31).

21.  Nysenbaum died on December 11, 2006.  (Joint Pretrial Statement ("JPS") at ¶ 16).

**The Formation of KIS and Ms. Lewis' Relationship with KIS**

22.  Prior to 2005, KIS operated as "KIS Logistics" with an address of P.O. Box 7666
Hicksville, NY  11801.  (See check #'s 046097, 046833, et. seq. in Ex. 16).  (N.T. at 115-116).[9]

---

[8]       The name of the company, Aerosoles, erroneously appears as "Aerosols" in the
transcript.

[9]       On May 16, 2007, Scott Barbanel, a Financial Analyst at Hartford sent a letter regarding
(continued...)

23.  Nysenbaum did not trust his former partner at KIS Logistics, Christopher Henning. (N.T. at 32, 120).

24.  In approximately 2005, Nysenbaum told Ms. Lewis that he was very upset that Chris Henning, his former partner, was stealing from him, and that she could help him by signing some checks.  (N.T. at 32).

25.  Ms. Lewis had no knowledge of the difference between KIS and KIS Logistics, but did understand there to be "two KISes."  (N.T. at 38, 127).

26.  Ms. Lewis viewed KIS as "Sam's company."  (N.T. at 37).

27.  An unsigned and undated KIS Operating Agreement states that Ms. Lewis was a Member and President of KIS Transport, LLC.  (the "Operating Agreement," Ex. P-2).  The Debtor testified that she has no knowledge of and has never seen this document.  (N.T. at 47, 90).

28.  The Debtor signed a one-page document, dated February 24, 2005, titled "Limited Liability Company Banking Resolution" (the "Banking Resolution").  (Ex. P-3).  The document showed her as a "Manager of KIS Transport LLC."  Ms. Lewis testified that she has no idea of what is in this document and did not read or even look at the document prior to signing it.  (N.T. at 33-34, 43).

29.  Ms. Lewis testified that she did not have an ownership in KIS, never participated in the business, never prepared invoices or arranged for shipping and never made any operational decisions for the Company.  (N.T. at 38, 39, 121).

---

[9](...continued)
this litigation which states, *inter alia*, "[m]y testing did reveal for the first 2 years of the scheme the payments included in the claim were made to KIS Logistics Inc. and not KIS Transport LLC.  After reviewing invoices from KIS Logistics, it appears that <u>the two companies are actually one and [sic] same</u>."  (Ex. 16, emphasis added).

30.   Ms. Lewis never spoke with anyone from Aerogroup or Aerosoles, nor did she have

any written communication with the company.  (N.T. at 39).

**KIS' Bank Account**

31.   KIS maintained a bank account at Commerce Bank; the account number was

7858121861 (the "Bank Account").  (JPS ¶ 10).

32.   Ms. Lewis was a signatory on the Bank Account.  (Ex. P-3).

32.   The Debtor twice signed a form regarding the Bank Account with Commerce Bank

dated February 24, 2005 (the "Commerce Bank Form").  The Debtor's title was denoted

"Manager of KIS Transport" under her signature on this form.  However, Ms. Lewis did not

read this document prior to signing it.  (N.T. at 43, 88; Ex. P-5).

33.   Ms. Lewis' social security number was on the Commerce Bank Form.  She did not

provide this information to the Bank, and assumes that Nysenbaum did.  (N.T. at 45).

34.   Ms. Lewis signed KIS checks, at Nysenbaum's request, until her "hand hurt[ ]."

(N.T. at 35, Ex. D-4).  The Debtor did not, however, fill in or date the checks, nor did she look at

the checks as she was signing them.  (N.T. at 37, 91, 101).

35.   Ms. Lewis neither deposited money into nor withdrew cash out of the Bank Account.

(N.T.  at 53, 119).

36.   The Debtor did not notice the name "KIS" or her address on the checks she signed.

(N.T. at  79).  Ms. Lewis thought that the Bank Account was Nysenbaum's.  (N.T. at 126).

37.   The only reason Ms. Lewis signed the checks was that Nysenbaum requested she do

so.  (N.T. at 77).

38.   Ms. Lewis signed at least 324 checks drawn on the KIS bank account.  (JPS ¶ 13).

39.   Several withdrawals and deposits were made on the Bank Account in Plainview,

-8-

New York, in addition to other locations which were not near the Debtor's Address.  (N.T. at
105-106, 108; Ex. P-19).

40.  The address on the Bank Account was the Debtor's Address from February through
August, 2005 and, after that time, was changed to an address in Old Bethpage, New York.  (N.T.
at 107-108, 121; Ex. 19).

**The Debtor's Receipt of Checks from KIS**

42.  The Debtor received a total of six checks from Nysenbaum, payable to her and drawn
on the KIS Bank Account.  (N.T. at 40; Ex. P-7).

43.  The checks received by Ms. Lewis from Nysenbaum total $16,050 and are dated
between June, 2005 and January, 2006.  (Ex. P-7).  Specifically, the checks made payable to the
Debtor and drawn on the Bank Account are as follows:

| Check  No. | Amount | Date |
|:---:|:---:|:---:|
| 112 | $3,000 | June 9, 2005 |
| 121 | $3,000 | July 13, 2005 |
| 130 | $2,550 | July 28, 2005 |
| 171 | $2,500 | November 7, 2005 |
| 179 | $2,000 | November 15, 2005 |
| 215 | $3,000 | January 12, 2006 |

44.  Ms. Lewis testified that Nysenbaum gave her these checks only to pay her back for
cash she lent him so that he could go to Atlantic City.[10]  (N.T. at 40, 48, 49).

---

[10]    According to Ms. Lewis, Nysenbaum went to Atlantic City "a lot."  (N.T. at 40).

45. The Debtor usually had cash on hand in her home from her dancing job.[11]  (N.T. at 47, 91).

46. According to Ms. Lewis, Nysenbaum's obesity made it difficult for him to run errands; therefore, he preferred to have Ms. Lewis go to the bank for him.  (N.T. at 53-54).

47. Other than receipt of these six checks, the Debtor received no money or income from KIS.  (N.T. at 40, 76, 91).

**The Debtor's Taxes**

*2004 taxes*

48. Anthony Spota, an accountant recommended by Nysenbaum, prepared the Debtor's 2004 tax returns.  (Ex. P-13).  Ms. Lewis never spoke to Mr. Spota; she relied on Nysenbaum to deal with her taxes.  (N.T. at 57, 58, 94).

49. The Debtor's 2004 personal income tax returns state, on Schedule C, that she earned $37,000 as a "personal care consultant."  However, Ms. Lewis never worked as a personal care consultant and did not give this information to Mr. Spota (she assumes that Nysenbaum did).  (N.T. at 57; Ex. P-13).

*2005 taxes*

50. The Debtor reported an adjusted gross income of $28,372 on her 2005 taxes, although she was not working at this time.  (Ex. P-13).  She filed a Schedule C, reporting that she was a "consultant," with a gross income of $35,500.  (Id.).  However, the Debtor was not a consultant and did not personally give this information to Mr. Spota, her accountant that year.  (N.T. at 66).

---

[11]     This was so, apparently, even though Ms. Lewis had stopped working as a dancer more than a year before these checks were cashed.  (N.T. at 51).  In 2005, when the checks to the Debtor from KIS were written, Ms. Lewis had between $5,000 and $10,000 in cash in her home.  (N.T. at 91).

51. Ms. Lewis signed and paid her 2005 taxes without reviewing the documents. (N.T. at 97- 98). She relied on Nysenbaum to know the amount that was due on her taxes and returned the check to him; "Sam took care of it for me." (N.T. at 124-125 (quote at 125)).

***2006 taxes***

52. Due to Nysenbaum's death in 2006, H&R Block prepared the Debtor's 2006 taxes. (N.T. at 70, 99). Ms. Lewis met with H&R Block and provided them with the appropriate paperwork. (Id.).

53. The Debtor's 2006 tax return (Schedule C-EZ) reports $6,102 in income from work as a "beauty consultant." (Ex. P-13). Ms. Lewis did not tell H&R Block that she worked as a beauty consultant, which she did not, and does not have any knowledge of who told them this information. (N.T. at 71- 73). The Debtor was not working at this time.

***1099s from KIS***

54. In 2005, Ms. Lewis received a 1099 taxable income form from KIS Transport, LLC, reporting $13,050 in income; in 2006 she received a 1099 from KIS, reporting $5,910 in income (together, the "1099s"). (Ex. P-13; N.T. at 76). Ms. Lewis gave at least the 2006 1099 to her accountant. (N.T. at 76).

**The Debtor's Charles Schwab Account**

55. Ms. Lewis maintained an investment account at Charles Schwab (the "Charles Schwab Account") that was set up by Jim Condon's father ("Mr. Condon"). The Charles Schwab Account was opened with money that the Debtor saved from working at the Club. (N.T. at 62, 95).

56. The Debtor set up the Charles Schwab Account when she was about 23 or 24 years old. (N.T. at 96).

57. Ms. Lewis opened the Charles Schwab Account because she wanted aggressively to save the money that she had earned working at the Club.[12] (N.T. at 62). The Debtor sought advice from men whom she met at the Club with regard to how to invest her money. (N.T. at 95).

58. In 2004, a total of $172,442.11 in stocks and mutual funds were purchased in the Debtor's Charles Schwab Account. (Ex. 13). These purchases were made by Mr. Condon. (N.T. at 64).

59. In 2005, a total of $257,295.77 in transactions were processed in the Charles Schwab Account. (N.T. at 69).

**Invoices and Mail to and from KIS**

60. Between approximately February 2005 and November 2006, KIS sent numerous invoices to Aerogroup for shipping services. (Ex. P-10). Because these invoices contained Aerogroup's address, it was "assume[d]" that they were received by Aerogroup. (N.T. at 9).

61. Between approximately April 2005 and November 2006, Aerogroup issued numerous checks to KIS for payment of invoices sent to it by the Company. (Ex. P-11).

62. Although the Debtor's Address was on the checks below KIS' name, it is not known whether or not the checks were sent to Ms. Lewis from Aerogroup.[13]

---

[12]    Ms. Lewis testified that she spent all the money in the Charles Schwab Account (thus, apparently, forcing her into bankruptcy). (N.T. at 73). The money mostly was spent on legal fees with regard to this litigation, but also on dental work, a car, expenses related to the care of her daughter, and health insurance. (N.T. at 73-74).

[13]    Mr. Spina testified that, in general, Aerogroup mails checks in window envelopes to the address on the checks. (N.T. at 12). However, because his duties include neither receiving invoices nor mailing out checks, no direct evidence that these checks were mailed to the Debtor was provided. (N.T.

(continued...)

-12-

63.    The Debtor received mail at her house for KIS Transport for "a little bit" in 2005-

perhaps a couple of weeks- but then the mail stopped coming.  When she received such mail,

Ms. Lewis gave it to Nysenbaum, unopened.  (N.T. at 38-39, 80).[14]

64.    Invoices from William Palumbo Trucking, Inc., a trucking company doing business

with KIS, had the Debtor's Address on them from April 2005 through approximately October

2006, but Palumbo testified that he has no direct knowledge of the mailing of the invoices and

that it is possible that they were sent somewhere else.  (N.T. at 141-144; Ex. 46).

65.    Palumbo spoke to Nysenbaum when dealing with KIS, and never to Ms. Lewis.

(N.T. at 145-6).

**Aerogroup and its Relationship with Hartford**

66.    During all relevant times in the litigation,[15] Aerogroup produced, manufactured,

distributed and sold shoes nationwide.  The shoes were shipped by third parties to various stores.

(JPS ¶ 4).

67.    Hartford, an insurance company, issued a fidelity bond, (policy # 13 BDD CZ 3300,

the "Bond"), in favor of Aerogroup.  The Bond covered all losses which are the subject matter

of this litigation.  (JPS ¶ 5).

---

[13](...continued)
at 15, 21).

[14]    The Debtor testified that she may also have received "one or two things" after
Nysenbaum died.  (N.T. at 80).

[15]    The parties agree that the relevant time period of the litigation is from 2003 through
2006 (the "Relevant Time Period").  (JPS ¶ 1).

68.   During the Relevant Time Period, Nysenbaum's duties as Shipping Manager at Aerogroup included coordinating the shipping of Aerogroup's merchandise.  (JPS ¶ 6).

69.   Pursuant to the terms of the Bond and the related release and assignment executed by Aerogroup and Hartford, Hartford has the right, title and interest to all losses sustained by Aerogroup.  (JPS ¶ 19).

**Charges and Losses to Aerogroup**

70.   KIS charged Aerogroup a total of $918,000.32 for shipping costs during the Relevant Time Period; these invoices were paid by Aerogroup.  (JPS ¶ 9).

71.   During this period, shipping companies with which KIS arranged to ship Aerogroup merchandise charged KIS $608,687.21.  (JPS ¶ 24).

72.   In approximately early 2007, Aerogroup made a claim on the Bond in the amount of $309,313.11.  (JPS ¶ 17).

73.   Because Aerogroup had a $15,000 deductible on its insurance policy, Hartford paid $294,313.11 to Aerogroup.  (JPS ¶ 21).

74.   The parties agree that Nysenbaum "either individually and/or on behalf of KIS, retained at least a portion" of this loss.  (JPS ¶ 35).[16]

75.   On March 19, 2008, Hartford settled its claims against Nysenbaum for $92,500.[17] (JPS ¶ 21).

76.   Ms. Lewis did not receive, endorse or sign any check from Aerogroup.  (N.T. at 113).

---

[16]      The parties further agree that Nysenbaum "conducted the theft . . . through the United States Postal Service and/or e-mail in interstate commerce."  (JPS ¶ 36).

[17]      It is unclear why the Proof of Claim does not take this settlement amount into account when calculating the damages alleged, but instead appears to seek damages on the full amount of Aerogroup's loss (multiplied by three per the RICO claim).

# IV.  DISCUSSION

## A.  The Debtor's Credibility

The Plaintiff is pursuing Ms. Lewis on a wide variety of causes of action.  Central to its theory is the notion that the Debtor's participation in the scheme with Nysenbaum to defraud Aerogroup was so extensive - her address was used, she signed her name to certain allegedly critical documents and to numerous checks, - that the defense of ignorance or of being an innocent bystander is insufficient and unconvincing.  Some counts on which Hartford seeks relief, such as conversion, do not have a specific *mens rea* requirement.  However, most of the causes of action for which the Plaintiff seeks relief, as discussed in detail below, do require that in order to be found liable one must have formed a specific intent.

The court therefore finds it important initially to address the fact that it found the Debtor at trial to be a highly credible witness.  Upon having the chance to observe Ms. Lewis over the course of the day-long trial, particularly after being subject to intense cross-examination, the court finds no reason to doubt Ms. Lewis' testimony that she did not have an intent to perpetrate, nor any knowledge or understanding of Nysenbaum's scheme to defraud Aerogroup.[18]

The Debtor does not strike one as lacking intelligence; but she is uneducated, unsophisticated and clearly relies on advice from the men in her life for all financial decisions.[19]

---

[18]    As further discussed in the Opinion, of critical relevance to the outcome is also the fact that the Debtor had no direct relationship with Aerogroup.  Ms. Lewis' dealings were only with Nysenbaum and KIS.

[19]    The Plaintiff's argument that Ms. Lewis' maintenance of the Charles Schwab Account evidences her business savvy misses the mark.  The Debtor's testimony revealed that she had little understanding or involvement with this investment account.  Rather, Ms. Lewis essentially asked her boyfriend's father to handle the trading and related details.  These facts are entirely consistent with Ms. Lewis' insistence that she paid no attention to the KIS documents she was signing and had no understanding of Nysenbaum's business dealings.

While it is true that Ms. Lewis signed numerous checks and several documents without asking

pertinent questions as to what she was signing and why, this fact does not dictate the outcome of

this proceeding for three reasons.  First, the Debtor signed these items without any knowledge of

Nysenbaum's scheme and, therefore, without any intent that these items would be used to

perpetrate a harm.  Second, as discussed below, the checks and KIS documents signed by

Ms. Lewis were not shown to have directly impacted or related to Aerogroup.  Finally, the

Debtor's reliance, given her lack of education, is entirely credible.

Further, the Debtor's testimony made clear that her relationship with Nysenbaum was not

conspiratorial in nature.  Rather, just as one might suspect of a dancer who befriends a patron at a

nightclub, Nysenbaum and Ms. Lewis appeared to have a friendship of convenience.  He

benefitted her by buying her trinkets, taking her out to dinner, treating her "like a person," and

helping with tax forms and the like.  In return, she helped him by joining him for dinner, running

errands, and, as it turned out, signing documents and checks after he told her that his partner was

cheating him.  This evidences ignorance and, perhaps, unwarranted trust on the part of the

Debtor, but not an intent to steal hundreds of thousands from Nysenbaum's employer -- a

company with which the Debtor had no contact and from which she received nothing directly.

The court finds Ms. Lewis' testimony that she signed checks and got money for

Nysenbaum ignorantly but not maliciously to be believable.  As noted above, she placed her trust

in the men in her life.  However misplaced that trust, it explains why she did things without

questioning the reasons.  It is not alleged that Ms. Lewis signed any document which was

presented to Aerogroup.  Consequently, as will be fleshed out below, Ms. Lewis will not be held

to have any intent to defraud Aerogroup or conspire with Nysenbaum.

## B. RICO and Conspiracy to Commit RICO Violations

In Counts One and Two of the Complaint, Hartford seeks to hold Ms. Lewis liable for

violations of the RICO statute and conspiracy to commit RICO violations. While the Debtor's

lack of intent to participate in any criminal or fraudulent scheme (as just discussed) would seem

to warrant simple disposal of these causes of action, both the complex nature of the statute and

the fact that the Plaintiff has sued under each subsection of RICO necessitate a lengthier

discussion.

RICO, which stands for "Racketeer Influenced and Corrupt Organizations," was intended,

in large part, to "protect legitimate enterprises by attacking and removing those who had

infiltrated them for unlawful purposes." In re Le-Nature's , Inc., 2011 WL 2112533, at *3 (W.D.

Pa. May 26, 2011) (quoting U.S. v. McDade, 28 F.3d 283, 296 (3d Cir. 1994)). According to the

Third Circuit:

> The RICO statute authorizes civil suits by "any person injured in his business or
> property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c)
> (1988). Section 1962 contains four separate subsections, each addressing a
> different problem. Section 1962(a) prohibits "any person who has received any
> income derived . . . from a pattern of racketeering activity" from using that money
> to acquire, establish or operate any enterprise that affects interstate commerce.
> Section 1962(b) prohibits any person from acquiring or maintaining an interest in,
> or controlling any such enterprise "through a pattern of racketeering activity."
> Section 1962(c) prohibits any person employed by or associated with an enterprise
> affecting interstate commerce from "conduct[ing] or participat[ing] . . . in the
> conduct of such enterprise's affairs through a pattern of racketeering activity."
> Finally, section 1962(d) prohibits any person from "conspir[ing] to violate any of
> the provisions of subsections (a), (b), or (c)."

Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1411 (3d Cir. 1991).

To prove that a defendant has committed any violation of the RICO statute, 18 U.S.C.

§ 1962, a plaintiff must first show a "pattern" of an underlying racketeering activity. See

-17-

Jennings v. Emry, 910 F. 2d 1434, 1439 (7th Cir. 1990) (quoting Triad Assoc., Inc. v. Chi. Hous.

Auth., 892 F.2d 583, 594 (7th Cir. 1989)); accord Brown v. Protective Life Ins. Co., 353 F.3d

405, 407 (5th Cir. 2003). A pattern requires commission of at least two acts from the list of

predicate offenses (in 18 U.S.C. §§ 1961(1) and (5)). Kehr, 926 F.2d at 1411-1412.

In addition, in order for a pattern of predicate acts to be established, the Plaintiff must

show that these acts are "related" and "amount to or pose a threat of continued criminal activity."

Kolar v. Preferred Real Estate Inv., Inc., 361 Fed. Appx. 354, 363, 2010 WL 104500, at *5 (3d

Cir. Jan. 12, 2010) (not precedential) (quoting H.J., Inc., v. Northwestern Bell Tel. Co., 492 U.S.

229, 239 (1989)); accord Jennings v. Emry, 910 F. 2d 1434, 1439 (7th Cir. 1990) (noting that "a

complaint asserting a pattern of racketeering activity must allege facts from which such a

continuous and related course of conduct-one indicating the threat of continuing criminal

activity-reasonably may be inferred"). Both the "relatedness" and "continuity" tests "depend

heavily on the specific facts of each case." Kehr, 926 F.2d at 1412.

Here, the Plaintiff alleges that the underlying predicate act to the Debtor's RICO violation

was either: 1) mail and/or wire fraud pursuant to 18 U.S.C. §§ 1341, 1343; or 2) theft in

interstate shipping pursuant to 18 U.S.C. § 659. See Trial Memo at 22.[20]

The preliminary (and determinative) question in our RICO analysis is thus whether

Ms. Lewis is responsible for either of these alleged predicate offenses; if not, then a RICO

---

[20]    The Trial Memo also alleges that Ms. Lewis violated 18 U.S.C. §§ 2314-2315, the
provision making it illegal to transport stolen property over state lines. (Trial Memo at 24). The court
will not consider this charge for three reasons: 1) this allegation was not made in the Complaint; 2) no
evidence was presented at trial that anyone stole property and transported it over state lines; and
3) violation of this provision requires knowledge that the goods in question were stolen or taken by fraud,
which was also not shown. U.S. v. Wright, 363 F.3d 237, 242 (3d Cir. 2004).

violation did not occur.  See In re Jamuna Real Estate, LLC, 2010 WL 2773395, at *3 (Bankr.

E.D. Pa. July 13, 2010) ("The modus operandi of a RICO defendant is through a 'pattern of

racketeering activity.'").

### Did the Debtor Commit the Predicate Offense of Mail and/or Wire Fraud?

The federal mail and wire fraud statutes prohibit the use of the mail or interstate wires for

purposes of carrying out any scheme or artifice to defraud.  18 U.S.C. §§ 1341, 1343.  A scheme

or artifice to defraud "need not be fraudulent on its face, but must involve some sort of fraudulent

misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and

comprehension."  Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004), *cert. denied* 543 U.S.

918 (2004) (citing Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 528 (3d Cir.

1998)).

In order for Hartford to prove that Ms. Lewis committed the predicate act of mail or wire

fraud, the Plaintiff must show: "(1) the defendant's knowing and willful participation in a

scheme or artifice to defraud; (2) with the specific intent to defraud, and (3) the use of the mails

or interstate wire communications in furtherance of the scheme."  Olick v. Northampton County

(In re Olick), 2010 WL 4509828, at *9 (E.D. Pa. Nov.9, 2010) (quoting U.S. v. Antico, 275 F.3d

245, 261 (3d Cir. 2001)) (citing U.S. v. Clapps, 732 F.2d 1148, 1152 (3d Cir. 1984)); accord U.S.

v. Andrews, --- F.3d ----, 2012 WL 1970884, at *13 (3d Cir. June 4, 2012).  This standard applies

to wire fraud cases as well.  U.S. v. Yusuf, 536 F.3d 178, 188 n.14 (3d Cir. 2008) (citation

omitted); Vanderbilt Mortg. & Fin., Inc. v. Flores, 789 F. Supp. 2d 750, 772 (S.D. Tex. 2011).

The defendant must have the specific intent to defraud, which "may be found from a material

misstatement of fact made with reckless disregard for the truth."  Walter v. Palisades Collection,

-19-

LLC, 480 F. Supp. 2d 797, 803 (E.D. Pa. 2007) (citing U.S. v. Coyle, 63 F.3d 1239, 1243 (3d

Cir. 1995) (quoting U.S. v. Hannigan, 27 F.3d 890, 892 n.1 (3d Cir. 1994))).

The evidence presented here in no way proves that Ms. Lewis violated the mail or wire

fraud statutes, much less that a pattern of such behavior existed.  In fact, Hartford failed even to

establish that Ms. Lewis had any knowledge of the scheme to defraud Aerogroup.  Nor did it

show that the Debtor  assisted Nysenbaum in the use of the mail or wires to defraud Aerogroup.

Lewis' alleged participation was by "sending paper mail and e-mail and/or in using her home

address and/or in assisting Nysenbaum in using paper and/or electronic mailings in furtherance of

the fraudulent scheme."  Trial Memo at 24.  Nothing of this nature was demonstrated at trial; the

Debtor was not aware of what Nysenbaum was up to and nothing suggests she knowingly

participated in his scheme.  The only evidence presented was the admitted short term use of her

home address for KIS mail.  This alone does not establish participation in activity involving

Aerogroup.

Ms. Lewis, therefore, is not liable for the predicate RICO offenses of mail and wire fraud.

### Did the Debtor Commit the Predicate Offense of Theft in Interstate Shipping?

The alternate RICO predicate offense alleged by Hartford is theft from interstate shipping.

The statute, 18 U.S.C. § 659, makes it a crime to:

> embezzle[], steal[], or unlawfully take[], carr[y] away, or conceal[], or by fraud or
> deception obtain[] from any pipeline system, railroad car, wagon, motortruck,
> trailer, or other vehicle, or from any tank or storage facility, station, station house,
> platform or depot or from any steamboat, vessel, or wharf, or from any aircraft, air
> cargo container, air terminal, airport, aircraft terminal or air navigation facility, or
> from any intermodal container, trailer, container freight station, warehouse, or
> freight consolidation facility, with intent to convert to his own use any goods or
> chattels moving as or which are a part of or which constitute an interstate or
> foreign shipment of freight, express, or other property. . . .

This provision is intended to protect the flow of interstate commerce and requires a showing of interstate commerce at the time of the theft.  U.S. v. Murray, 946 F.2d 154, 156 (1st Cir. 1991) (citations omitted).  The "goods" covered in section 659 include money and cash.  U.S. v. Bryser, 954 F.2d 79, 85 (2d Cir. 1992).  The facilities protected by the interstate shipping statute may be broken into four main categories: (1) means of surface transportation (vehicles and the like); (2) support facilities for surface transportation (tank or storage facility); (3) means of interstate shipment over water and support facilities (steamboat or vessel); and (4) means of interstate air shipment and support facilities (aircraft, etc.).  Id.  The plaintiff must prove that the goods were stolen from one of these enumerated places.  U.S. v. Allegrucci, 299 F.2d 811, 812 (3d Cir. 1961) (emphasis added).  It must also be shown that the defendant knew that the goods at issue were stolen; such proof is "essential."  U.S. v. Allegrucci, 258 F.2d 70, 73 (3d Cir. 1958).

Application of the above standard to the evidence presented at trial makes it clear that Ms. Lewis has not committed theft in interstate shipping.  Preliminarily, no theft from the enumerated *places* detailed in the statute has been alleged by Hartford, *i.e.* there has been no allegation, much less proof, of interstate thievery pursuant to 18 U.S.C. § 659.  The Plaintiff alleges that the Debtor stole money in connection with shipping goods; this is not equivalent to physically stealing from an interstate commerce facility.  Further, no evidence has been offered that Ms. Lewis had knowledge as to the suspect nature of any goods or money she may have been receiving.  For these reasons, theft by interstate shipping may not serve as a predicate RICO offense.

Hartford has failed to show that the Debtor committed a pattern of an underlying

racketeering activity.  For this reason, the Plaintiff may not prevail on its RICO claim.[21]

### C. Fraud

In addition to the federal statutory offense of RICO, Hartford also alleges that the Debtor

committed common law fraud by her participation and assistance in Nysenbaum's scheme.  To

establish fraud in Pennsylvania, a plaintiff must prove:

(1) misrepresentation of a material fact;

(2) scienter;

(3) intention by the declarant to induce action;

(4) justifiable reliance by the party defrauded upon the misrepresentation; and

(5) damage to the party defrauded as a proximate result.

Colaizzi v. Beck, 895 A.2d 36, 39 (Pa. Super. Ct. 2006).  See also Lorah v. Sun Trust

Mortg., Inc., 2010 WL 5342738, at *4 n.10 (E.D. Pa. Dec. 17, 2010); Ndubizu v. Drexel Univ.,

768 F. Supp. 2d 796, 803 (E.D. Pa. 2011).  As discussed below, Hartford did not prove any of

these elements at trial.

### *Misrepresentation of a Material Fact*

A misrepresentation is material if "it is of such character that if it had not been

misrepresented, the transaction would not have been consummated."  Colaizzi, 895 A.2d 36, at

---

[21]     Because the Plaintiff's substantive RICO cause of action has no merit, its conspiracy to
commit RICO allegation cannot survive and will not be considered.  See Kehr Packages, Inc. v. Fidelcor,
Inc., 926 F.2d 1406, 1411 n.1 (3d Cir. 1991); Kolar v. Preferred Real Estate Investments, Inc., 361 Fed.
Appx. 354, 366, 2010 WL 104500, at *7 (3d Cir. Jan. 12, 2010) (not precedential) ("any claim under
section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must
fail if the substantive claims are themselves deficient.") (quoting Lightning Lube v. Witco Corp., 4 F.3d
1153, 1191 (3d Cir. 1993)).

39-40; GMH Assoc., Inc. v. The Prudential Realty Group, 752 A.2d 889, 902 (Pa. Super. 2000)

(citation omitted).  Silence "in the absence of a duty to speak" does not amount to fraudulent

concealment.  GMH, 752 A.2d at 902.  Hartford contends that the Debtor misrepresented to

Aerogroup that her home address was that of KIS.  Trial Memo at 13.  Further, the Plaintiff

contends that by signing KIS' Banking Resolution, the Debtor misrepresented that she was a

manager and member of KIS.  Id.;  See Finding of Fact no. 28.[22]

Hartford may not prevail on this cause of action first of all because it failed to produce

evidence that Ms. Lewis made any misrepresentations at all *to Aerogroup*.  At the trial, evidence

was offered to the contrary; Ms. Lewis testified that she never spoke with nor did she have any

written contact with anyone at Aerogroup.  See Finding of Fact No. 30.  The Plaintiff did not

prove otherwise and, in fact, did not show that Aerogroup was aware of the Banking Resolution,

the Commerce Bank Form or that Ms. Lewis asserted her address as that of KIS.

In addition, Hartford has not demonstrated that the existence of these documents was a

*material* fact, i.e. there has been no showing that Nysenbaum's scheme could not have been

consummated without Ms. Lewis' participation.  Given that the KIS entity (then operating as

"KIS Logistics") existed prior to any involvement by the Debtor, it would certainly be difficult

for the Plaintiff to assert that Nysenbaum's scheme was impossible without Ms. Lewis.

### Scienter or Intention by the Declarant to Induce Action

A defendant who makes a false statement without the requisite intent or scienter is not

guilty of fraud.  U.S. v. Saybolt, 577 F.3d 195, 204 (3d Cir. 2009); Restatement (Second) of

---

[22]     Hartford here seeks to have it both ways.  In other words, the Plaintiff's argument that
the Debtor misrepresented herself as a director of KIS contradicts its general assertion that the Debtor
*was* such a manager.

Torts § 526; Leason v. Berg, 927 F.2d 609 (9th Cir. 1991) (unpublished) (applying California law); Marci's Fun Food, LLC v. Shearer's Food's Inc., 2011 WL 5360808, at *4-5 (W.D. Pa. Nov. 7, 2011) (granting summary judgment to Plaintiff on fraud count due to lack of evidence of intent); In re Marta Group, Inc., 47 B.R. 220, 224 (Bankr. E.D. Pa. 1985) (finding that Plaintiff could not recover for fraud where there was no evidence of Defendant's intent). No showing of the Debtor's intent was made by Hartford. The court will not belabor this point, since it has already discussed that Ms. Lewis did not have the requisite *mens rea* to perpetrate a fraudulent scheme against Aerogroup.

### Justifiable Reliance by the Party Defrauded upon the Misrepresentation

The Plaintiff complaining of fraud must show not just reliance, but detrimental reliance, *i.e.*, that it suffered harm as a result of relying on the fraudulent conduct. Debs v. Chrysler Corp., 810 A.2d 137, 157 (Pa. Super. 2002); Ndubizu, 768 F. Supp.2d. at 804.

Hartford contends that "Aerogroup relied on [the Debtor's] misrepresentations when it paid the KIS invoices and forwarded the payments to her home address." Trial Memo at 13.

This contention was not supported by any evidence at trial.

After all, how could Aerogroup have relied on the alleged misrepresentations of the Debtor when it had no contact or relationship with her? Cf. State Farm Mut. Auto. Ins. Co. v. Lincow, 715 F. Supp. 2d 617, 631 (E.D. Pa. 2010), *aff'd* 444 Fed. Appx. 617 (3d Cir. Sept. 16, 2011) (upholding, *inter alia*, a jury award for fraud claim in suit alleging scheme to defraud insurers). In State Farm, the court noted that the Plaintiff's corporate witness provided "detailed . . . first hand knowledge" that it had "in fact, relied on the patients' records in the evaluation and payment of the claims." Id. at 631. Such detailed testimony allowed the State Farm court to

conclude that the Plaintiff had 'showed actual reliance' supporting its fraud claim." Id. at 631.

No such reliance was proven here.

### *Damage to the Party Defrauded as a Proximate Result*

Proof that Hartford suffered damages as a result of Ms. Lewis' alleged fraud, like the

other elements of this common law tort, must be proven by clear and convincing evidence.

Rubenstein v. Dovenmuehle Mortg., Inc., 2009 WL 3467769, at *5 (E.D. Pa. Oct. 28, 2009)

(citing Santanta Prod., Inc. v. Bobrick Washroom Equip, Inc., 401 F.3d 123, 136 (3d Cir. 2005)).

Hartford failed to offer such compelling evidence.  Given that the Debtor had no contact or

communication with Aerogroup and that there has been no showing that she was in charge of or

authorized to ship Aerogroup merchandise, the Plaintiff has not proven by clear and convincing

evidence that its damages were caused by Ms. Lewis.

Because none of the above elements of common law fraud has been satisfied, the Plaintiff

may not prevail on its claim that Ms. Lewis committed fraud.

### D. Conspiracy to Commit Fraud

The lack of viability of a fraud cause of action also means that Hartford may not succeed

on its count for conspiracy to commit fraud.  The elements of a claim of civil conspiracy are:

"1) a combination of two or more persons acting with a common purpose to do an unlawful act

or to do a lawful act by unlawful means or for an unlawful purpose, 2) an overt act done in

pursuance of the common purpose, and 3) actual legal damage."  Phillips v. Selig, 959 A.2d 420,

437 (Pa. Super. 2008) (citation omitted).  See also State Farm Mut. Auto Ins. Co. v. Ficchi, 2011

WL 2313203, at *11 (E.D. Pa. June 13, 2011) ("under Pennsylvania common law, to plead a

claim for civil conspiracy, [Plaintiff] must show that two or more persons 'combined or agreed

with intent to do an unlawful act or to do an otherwise lawful act by unlawful means.'")
(citations omitted).

A discussion of whether the elements of conspiracy have been shown here is not
necessary, however, due to the fact that the Plaintiff has failed to prove that the Debtor
committed fraud.  It is well settled that "civil conspiracy may not exist without an underlying
tort." Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 405 (3d Cir. 2000) (citation
omitted).  See also GMH, 752 A.2d 889 at 905 ("Because we conclude that no fraud was
committed, we correspondingly find that no civil conspiracy to defraud occurred."); In re
Orthopedic Bone Screw Prods. Liab. Litig., 193 F.3d 781, 789 (3d Cir. 1999) ("The established
rule is that a cause of action for civil conspiracy requires a separate underlying tort as a predicate
for liability. . . .  Standing alone, a conspiracy does no harm and engenders no tort liability.  It
must be activated by the commission of an actual tort.") (quotation marks and citations omitted);
Pellegrino v. U.S. Transp. Sec. Admin., 2012 WL 661773, at *9 (E.D. Pa. Feb. 28, 2012) ("In the
end, only a finding that the underlying tort has occurred will support a claim for civil
conspiracy.")  (quotation marks and citation omitted); Glass v. City of Philadelphia, 455 F. Supp.
2d 302, 359 (E.D. Pa. 2006) ("Unlike in the criminal conspiracy context, where the crime lies in
the agreement itself, a cause of action for civil conspiracy requires a distinct underlying tort as a
predicate to liability.") (citations omitted).

Because Ms. Lewis did not perpetrate a fraud on Hartford, neither is she liable for
conspiracy to commit fraud.[23]

--------

[23]     The Plaintiff's Trial Memo alleges, for the first time, that the Debtor conspired to
commit not just fraud but also negligent misrepresentation, unjust enrichment, and or conversion.  Trial
(continued...)

**E. Negligent Misrepresentation**

Although it is the last count of the Complaint, because the elements of negligent

misrepresentation and fraud are so similar, see, e.g. Liebman v. Prudential Fin., Inc., 2002 WL

31928443, at *5 (E.D. Pa. Dec. 30, 2002); Coram Healthcare Corp. v. Aetna U.S. Healthcare,

Inc., 94 F. Supp. 2d 589, 595 (E.D. Pa. 1999), the court will next discuss Hartford's claim of

negligent misrepresentation.

In order to prevail under this cause of action, the Plaintiff must prove each of the

following:

(1) a misrepresentation of a material fact;

(2) made under circumstances in which the misrepresenter ought to have known its
falsity;

(3) with an intent to induce another to act on it; and

(4) which results in injury to a party acting in justifiable reliance on the
misrepresentation.

Smith v. Lincoln Benefit Life Co., 395 Fed. Appx. 821, 824, 2010 WL 3730196, at *3 (3d Cir.

Sept. 24, 2010) (non precedential) (finding that the complaint "failed to state how the [defendant]

detrimentally relied upon or was injured" by the misrepresentation) (citing Bilt-Rite Contractors,

Inc. v. The Architectural Studio, 866 A.2d 270, 277 (Pa. 2005)); accord Azarchi-Steinhauser v.

Protective Life Ins. Co., 629 F. Supp. 2d 495, 501 (E.D. Pa. 2009) (finding that plaintiffs did not

knowingly make a material misrepresentation); Brandow Chrysler Jeep Co. v. DataScan Tech.,

511 F. Supp. 2d 529, 536 (E.D. Pa. 2007).  A plaintiff must prove the elements of negligent

---

[23](...continued)
Memo at 18-20.  Count IV of the Complaint only states a claim for conspiracy to commit fraud;
therefore, these additional, tardy allegations will not be considered.  (Doc. # 1).

misrepresentation by a preponderance of the evidence.  Banco Urquijo S.A. v. Signet

Bank/Maryland, 861 F. Supp. 1220, 1247-48 (M.D. Pa. 1994).

As a preliminary matter, Hartford cannot prevail on this cause of action because it has not

shown that Ms. Lewis owes it a duty.  The tort of negligent misrepresentation is "premised on the

existence of a duty owed by one party to another."  Gibbs v. Ernst, 647 A.2d 882, 890 (Pa. 1994)

(holding that an adopting parent may state a claim for negligent misrepresentation because an

adoption agency "has assumed a duty to tell the truth when it volunteers information to

prospective parents . . . ."); Restatement (Second) of Torts § 552, cmt. (c) (1977) ("If [a

defendant] has no pecuniary interest and the information is given purely gratuitously, he is under

no duty to exercise reasonable care and competence in giving it"); Schnell v. Bank of N.Y.

Mellon, 2011 WL 5865966, at *5 (E.D. Pa. Nov. 22, 2011) (dismissing negligent

misrepresentation cause of action because no evidence of duty between the plaintiff and

defendant); State College Area Sch. Dist. v. Royal Bank of Can., 2011 WL 5822164, at *19

(M.D. Pa. Nov. 18, 2011) (dismissing negligent misrepresentation claim against third-party

defendant due to lack of duty to provide information); Lind v. Jones, Lang LaSalle Americas,

Inc., 135 F. Supp.2d 616, 621 n.3 (E.D. Pa. 2001) ("There is nothing in this record to suggest that

Defendant owed any duty to the Plaintiff as is required to maintain a cause of action for negligent

misrepresentation.").

While a plaintiff can state a claim for negligent misrepresentation when one assumes a

duty to tell the truth by making an affirmative statement, see Bionix Dev. Corp. v. Sklar Corp.,

2009 WL 3353154, at *4 (E.D. Pa. Oct. 14, 2009) (citing Gibbs v. Ernst, 647 A.2d 882, 891 (Pa.

1994)), there is no evidence here that the Debtor made an affirmative statement *to the Plaintiff or*

*its insured*.  At best, Hartford could argue (although it has not) that by signing the Banking

Resolution, the Commerce Bank Form, and the blank KIS checks Ms. Lewis made an affirmative

statement and thereby created a duty *to KIS*.[24]  Findings of Fact nos. 28, 32, 33, 35; <u>I&S</u>

<u>Assoc.Trust v. LaSalle Nat. Bank</u>, 2001 WL 1287522, at *5 (E.D. Pa. Oct. 23, 2001) ("the

negligent misrepresentation defendant must have owed a duty *to the injured party*") (citation

omitted and emphasis added).  Hartford failed to present any legal or factual support to suggest

that a duty by Ms. Lewis to KIS (assuming that one existed) would create a duty by the Debtor to

the Defendant or its insured.  For this reason alone, the negligent misrepresentation cause of

action lacks merit.[25]

        In addition to this fatal flaw, Hartford has failed to offer evidence sufficient to support

each of the four elements necessary to support a claim of negligent misrepresentation.  No

showing was made that the Debtor's alleged  misrepresentations - her signatures on the

documents and checks - were material to Hartford's loss.  "A misrepresentation is material when

it is of such a character that if it had not been made, the transaction would not have been entered

---

[24]     Hartford argues that the Debtor cannot escape liability by claiming ignorance, in part,
because the Banking Resolution and the Commerce Bank Form each makes clear on its face that the
signatories have read the documents prior to signing them.  (<u>See</u> N.T. at 156-57).  Because the court
decides the issues presented on other grounds, it need not reach this question.

        However, it is worth noting that Aerogroup is not a party to any of the documents signed by Ms.
Lewis, nor has the Plaintiff showed that these items were presented or made available to Aerogroup.  In
other words, the Banking Resolution and the Commerce Bank Form do not evidence that Ms. Lewis
made representations *to Aerogroup*.

[25]     Hartford's argument that the Debtor's turning "a blind eye" to certain occurrences such
as the receipt of mail to her house amounts to a negligent misrepresentation is even harder to fathom.
Trial Memo at 16.  First, Ms. Lewis' inaction did not rise to the level of a "statement" and thus is not a
preface to a successful negligent misrepresentation cause of action.

into." Delahanty v. First Penn Bank, N.A., 464 A.2d 1243,1252 (Pa. Super. Ct. 1983) (citation omitted).

The KIS enterprise existed prior to any alleged involvement by the Debtor. Hartford itself viewed these two companies (*i.e.* before and after the documents and checks were signed by Ms. Lewis) as one in the same. See Ex. 16. The Bank Account, after briefly reflecting the Debtor's Address, was diverted to a different address.[26] The Debtor had no contact with Aerogroup or its customers and viewed KIS as belonging to and being controlled by Nysenbaum. It simply makes no sense to assert that Nysenbaum's scheme could not have transpired without the involvement of the Debtor.

Nor did Hartford show that it justifiably relied on a misrepresentation by the Debtor (the fourth element of negligent misrepresentation). First and foremost, there is no indication that Hartford actually relied on any information provided by Ms. Lewis. As discussed, she had no duty to Aerogroup (or to the Plaintiff) primarily because the Debtor had essentially no relationship with Aerogroup. The evidence at trial showed that Ms. Lewis had no contact with anyone at the company. Aerogroup's dealings were entirely with Nysenbaum; Hartford does not argue to the contrary.

For all these reasons, the Plaintiff cannot prevail on its claim of negligent misrepresentation.[27]

---

[26]     In his closing remarks at the trial, counsel for Hartford asserted that if it were not for the use of Ms. Lewis' address, Aerogroup would have been able to detect that payments were being sent to Nysenbaum. (N.T. at 158). However, upon questioning, counsel conceded that the Debtor's participation was not, in fact, critical. ("yes, a different scheme could have occurred. . . .") (N.T. at 159).

[27]     The court has considered Keenan's Estate, 16 Pa. D&C 676 (Pa. Orph. 1932), the 80
(continued...)

-30-

**F. Unjust Enrichment**

Hartford next asserts that the Debtor benefitted unfairly from her alleged involvement

with the KIS scheme and, therefore, that she is liable under the doctrine of unjust enrichment.

"To recover under the equitable doctrine of unjust enrichment, otherwise known as 'quasi-

contract' or 'implied-in-law contract,' a plaintiff must establish the following:

> (1) benefits conferred on defendant by plaintiff,
>
> (2) appreciation of such benefits by defendant; and
>
> (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.

Kia v. Imaging Scis. Int'l, Inc., 735 F. Supp. 2d 256, 269 (E.D. Pa. 2010) (quoting Wiernik v. PHH

U.S. Mortgage Corp., 736 A.2d 616, 622 (Pa. Super. Ct. 1999)), appeal denied, 751 A.2d 193 (Pa.

2000)); see also EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 273-74 (3d Cir. 2010).[28]

"When considering the validity of a claim for unjust enrichment, we must focus on

'whether the enrichment of the defendant is unjust.  The doctrine does not apply simply because

the defendant may have benefitted as a result of the actions of the plaintiff.'"  Wiernik, 736 A.2d

at 622 (citations omitted); see also Kia, 735 F. Supp. 2d at 269; accord EBC, 618 F.3d at 273 ("a

claimant must show that the party against whom recovery is sought either wrongfully secured or

passively received a benefit that . . . would be unconscionable for her to retain.") (citation

omitted).  The inquiry is fact specific.  Kia, 735 F. Supp.2d at 269.

---

[27](...continued)
year-old case relied on by the Plaintiff.  Because that case does not address negligent misrepresentation
and involves defendants who were experienced business people, the court finds it inapposite.

[28]      "A plaintiff cannot recover for unjust enrichment when an express contract governs the
relationship between the parties."  Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 507 (E.D. Pa.
2008) (citing Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 999 (3d Cir. 1987)).

Malice on the part of the defendant is not required to show unjust enrichment.  "It is clear that a showing of knowledge or wrongful intent on the part of the benefitted party is not necessary in order to show unjust enrichment.  Rather, the focus is on the resultant unjust enrichment; not on the party's intention." Crossgates Realty, Inc. v. Moore, 420 A.2d 1125, 1128 (Pa. Super. Ct. 1980) (citing Gee v. Eberle, 420 A.2d 1050, 1059 (Pa. Super. Ct. 1980)); see also Stilwell Value Partners I, L.P. v. Prudential Mut. Holding Co., No. 06-4432, 2007 WL 2345281, at *11 (E.D. Pa. Aug. 15, 2007) (quoting Torchia v. Torchia, 499 A.2d 581, 583 (Pa. Super. Ct. 1985)).  Plaintiff must prove the elements of unjust enrichment by a preponderance of the evidence.  Banco Urquijo S.A. v. Signet Bank/Maryland, 861 F. Supp. 1220, 1247-48 (M.D. Pa. 1994).

Because Hartford failed to prove that any benefit to Ms. Lewis was conferred by Aerogroup, this cause of action fails.

A litigant may not succeed on a claim for unjust enrichment without first demonstrating that a defendant has benefitted from the plaintiff - prong one of the above test.  See Nicole Med. Equip. & Supply, Inc. v. Tricenturion, Inc., 2011 WL 1162052, at *7 n.46 (E.D. Pa. Mar. 28, 2011) (finding that plaintiff had failed to state a cause of action for unjust enrichment because "Plaintiff does not allege any facts reflecting the contours of an *agreement* between it and Defendants from which Defendants benefitted financially, nor a benefit *Plaintiff* conferred upon Defendants under such circumstances that it would be inequitable for Defendants to retain the benefit without payment *to Plaintiff*.") (emphasis in original and citation omitted).  See also Poskin v. TD Banknorth, N.A., 687 F. Supp. 2d 530, 562 (W.D. Pa. 2009) ("Because the first element of unjust enrichment is not satisfied, the other two necessarily fail; there was no benefit

to be appreciated, accepted, or retained by [the Defendant].”); <u>Meehan v. Cheltenham Twp.</u>, 189

A.2d 593, 595 (Pa. 1963) (“In any event, [plaintiff] cannot merely allege its own loss as the

measure of recovery - <i>i.e.</i>, the value of labor and materials expended - but instead must

demonstrate that [defendant] has in fact been benefitted.”) (footnote omitted); <u>Burrell v.

Workers’ Comp. Appeal Board (Phil. Gas Works and Compservices, Inc.)</u>, 849 A.2d 1282, 1288-

89 (Pa. Commw. Ct. 2004) (finding no unjust enrichment where no evidence of benefit or

compensation to employee); <u>Bouriez v. Carnegie Mellon Univ.</u>, 2005 WL 3006831, at *10-11

(W.D. Pa. Nov. 9, 2005) (cause of action for unjust enrichment fails where, among other things,

complaining party did not show benefit conferred).

Here, Hartford has failed to produce evidence showing that the Debtor has received any

benefit from the Plaintiff.  According to Hartford, the benefits conferred on Ms. Lewis can be

placed in two general categories: (1) the gifts, trinkets, trips, etc. that she received from

Nysenbaum; and (2) the total of $18,960 allegedly paid to the Debtor by KIS in 2005 and 2006 as

shown on the 1099s.[29]

The testimony revealed that the benefits received by Ms. Lewis from Nysenbaum were

not nearly as extensive as Hartford asserts.  The two took a few of trips to Atlantic City and

Vegas.  He bought the Debtor and her daughter a few “trinkets” and let her keep the change after

running errands for him.  Nysenbaum may have paid for dinner on occasion and purchased a

---

[29]     At trial, the Plaintiff conceded that the six checks cashed by Ms. Lewis (which it
calculates total $13,000 and the court calculates to be $16,050, <u>see</u> finding of fact no. 43) were included
in the amounts submitted on the 1099s.  (N.T. at 164-5).  Ms. Lewis credibly testified that she provided
cash to Nysenbaum for the amounts of these six checks.  <u>See</u> Finding of Fact no. 44.

gown for Ms. Lewis.  The parties essentially agree on this.  However, Hartford cannot hang its

unjust enrichment claim on this fact because we have no way of knowing - and the Plaintiff has

not proven - that the funds used by Nysenbaum to purchase items for the Debtor came from

Aerogroup.  Making this determination would be a two-step process.  First, the Plaintiff must

show that *all* of Nysenbaum's funds came from KIS.  Next, Hartford would need to demonstrate

that KIS existed solely due to its relationship with Aerogroup, *i.e.* that *all* of KIS' funds were

funneled from Aerogroup.

Hartford proved neither.  In fact, given that Nysenbaum was a gambler and a schemer, as

well as a legitimately employed individual, there is simply no way of knowing what the source of

the funds were that Nysenbaum used to purchase trips, gowns and the like for the Debtor.  The

evidence, therefore, does not establish that Ms. Lewis benefitted from or was unjustly enriched

by Aerogroup as a result of gifts from Nysenbaum.

Equally fatal to Hartford's claim for unjust enrichment is the fact that the Plaintiff has

failed to show that a payment from KIS necessarily equals a payment from Aerogroup.  In other

words, even if Ms. Lewis did receive $18,960 from KIS, why should we presume that she

received a benefit from Aerogroup?  While we can infer that some funds filtered through KIS

came from Aerogroup - that much is agreed - there is no reason to assume that Aerogroup was

KIS' only "customer" or that neither this sham company nor Nysenbaum had other sources of

revenue, legitimate or illegitimate.  In fact, Hartford has not even argued, much less offered

evidence to prove, that Aerogroup was KIS' only source of revenue.  For this reason alone, the

court cannot conclude that the Defendant received a benefit from the Plaintiff. The cause of

action for unjust enrichment, therefore, fails.

### G. Conversion

Lastly, the Plaintiff seeks to recover pursuant to a theory of common law conversion,

asserting that Ms. Lewis has unjustly and illegally usurped Aerogroup's property as her own.

Under Pennsylvania law, the elements of conversion are:

> (1) the deprivation of another's right of property, or use or possession of a chattel, or other interference therewith;

> (2) without the owner's consent; and

> (3) without legal justification.

Universal Premium Acceptance Corp. v. York Bank & Trust Co., 69 F.3d 695, 704 (3d Cir.

1995) (quoting Cenna v. U.S., 402 F.2d 168, 170 (3d Cir. 1968)); see also Pierre & Carlo, Inc. v.

Premier Salons, Inc., 713 F. Supp. 2d 471, 480 (E.D. Pa. 2010); Prudential Ins. Co. of America v.

Stella, 994 F. Supp. 318, 323 (E.D. Pa. 1998).

Money may be converted only "where the plaintiff had a property interest in the money at

the time of the alleged conversion." Kia v. Imaging Sciences Int'l , Inc., 735 F. Supp. 2d 256,

270 (E.D. Pa. 2010) (citing cases and holding that conversion claim failed because "there is

nothing in the record to show that [plaintiff] had any property interest in the money allegedly

converted by the . . . defendants"); Thomas v. Phila. Hous. Auth., 2011 WL 2415157, at *8 (E.D.

Pa. June 15, 2011) (citing Kia); In re Olick, 2011 WL 5075104, at *6 (Oct. 26, 2011) (finding

that Plaintiff failed to state a claim for conversion because, *inter alia*, he had no interest in funds

 at issue); Lariviere, Grubman & Payne, LLP v. Phillips, 2008 WL 4097466, at *5 (D. Colo.

Sept. 4, 2008) (applying Colorado law).

A Plaintiff must prove the elements of conversion by a preponderance of the evidence. Chrysler Credit Corp. v. First Nat'l. Bank and Trust Co. Washington, 746 F.2d 200 (3d Cir. 1984).

Hartford asserts that Ms. Lewis "intentionally accepted moneys from KIS that were wrongfully obtained from Aerogroup, thereby exercising dominion and control."  Trial Memo at 18.  The Plaintiff's argument is that by accepting money from KIS, the Debtor essentially converted *Aerogroup's* funds because Aerogroup was a victim of Nysenbaum and KIS's fraudulent shipping scheme.  However, for reasons just discussed, these assumptions cannot be made.  First, there is inconclusive evidence that the Debtor actually gained financially from KIS. Second, and more critically, Hartford has not demonstrated that Aerogroup was the only source of funding for KIS.  Because the Plaintiff failed to prove that it has an interest in the property allegedly converted by the Debtor, this cause of action fails as well.

## H.  Nondischargeability Pursuant to §§ 523(a)(2) and (4)

Because, as discussed, the Debtor is not liable to Hartford under any of its stated substantive causes of action, the court need not reach the issue of nondischargeability pursuant to 11 U.S.C. §§ 523(a)(2) and (4).

The preliminary inquiry with regard to all dischargeability proceedings is whether or not the debtor owes an obligation to the creditor.  See e.g, In re August, 448 B.R. 331, 346-47 (Bankr. E.D. Pa. 2011) (citing cases); In re Jadczak, 2011 WL 13612, at *5 (Bankr. E.D. Pa. Jan. 4, 2011).  Here, the answer to that question is no.  The Plaintiff did not come forward with sufficient evidence of Defendant's liability.  Therefore, the court need not address the second question of whether such debt is dischargeable.

-36-

# I. Proof of Claim

As stated at the outset, trial in this matter was a consolidated proceeding on the Plaintiff's Adversary Proceeding and its Proof of Claim.  The Proof of Claim was filed on October 4, 2010, approximately one month after the Complaint was filed.  It seeks $929,985.60 in damages[30] and is based on the precise seven causes of action on which this Adversary Proceeding seeks relief.  On November 12, 2010, the Debtor filed an objection to the Proof of Claim (Doc. # 54 in the main case, the "Objection"), asserting, in sum (and among more detailed objections), that "Hartford has failed to allege facts sufficient to support a legal liability of the Debtor to Hartford in the Proof of Claim because no legal liability exists."  Objection ¶ 17.

The standard for analyzing the shifting burden of a proof of claim was set forth by the Third Circuit in In re Alleghany Intern., Inc., 954 F.2d 167 (3d Cir. 1992):

> The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. § 502(a) rests on different parties at different times.  Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is "*prima facie*" valid. . . .  In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward.  The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim.  It is often said that the objector must produce evidence equal in force to the *prima facie* case. . . .  In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.  If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. . . .  <u>The burden of persuasion is always on the claimant.</u>

---

[30]        This figure is reached by tripling Aerogroup's alleged loss of $309,995.20 (the treble damages are based on the RICO cause of action).  <u>See</u> Proof of Claim Part 2, p.2.  Again, it is unclear why the Plaintiff did not subtract the $92,500 recovered from Nysenbaum's estate when calculating its losses.

954 F.2d at 173 (emphasis added).  See also In re New Century TRS Holdings, Inc., 446 B.R.

656, 662 (Bankr. D. Del. 2011); In re Reading Broad., Inc., 2008 WL 2705547, at *3 (Bankr.

E.D. Pa. July 8, 2008).

In this case, by providing evidence to negate more than one of the Plaintiff's allegations

in the Proof of Claim, the Debtor shifted the burden back to Hartford.[31]  In other words, the

burden of persuasion with regard to the Proof of Claim rested with the Plaintiff.  And, as already

detailed in this Opinion, Hartford failed to produce sufficient evidence to merit relief with regard

to any of the seven causes of action on which it sought relief.  Therefore, the Proof of Claim will

be entirely disallowed.


# V.  CONCLUSION

For all of the reasons discussed above, the court determines that the Plaintiff has failed to

meet its burden of proof with regard to each of the seven causes of action stated in both the

Adversary Proceeding and the Proof of Claim.  Accordingly, judgment for the Debtor/Defendant

will be entered with regard to the Adversary Complaint, and the Proof of Claim will be

disallowed.  An appropriate order will follow.

**Date:   July 19, 2012.**

_____
JEAN K. FITZSIMON
United States Bankruptcy Judge

---

[31]      In addition to the paragraph already cited, see also, inter alia, paragraphs 26, 29, 31, 32, and 33 of the Objection, in which the Debtor denies in detail that she had any involvement, knowledge or participation in the activities alleged as the basis for liability stated in the Proof of Claim.  Ms. Lewis' testimony consistent with that Objection squarely shifted the burden back to Hartford.